AO 106 (Rev 04/10) Application for a Search Warrant (requesting AUSA JOHN S. HAN

# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Chick's Philly, 1805-1807 Washington Avenue, Philadelphia,<br>Pennsylvania (for more particularized description, See<br>Attachment A) | )<br>)<br>)<br>)<br>)<br>) |

Case No. **19-141-M**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*

Chick's Philly, 1805-1807 Washington Avenue, Philadelphia, PA, (for more particularized description, See Attachment A)

located in the _____ Eastern _____ District of _____ Pennsylvania _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U S C. §§ 892 and 894 | Making extortionate extensions of credit; conspiracy to collect and collections of extension of credit by extortionate means |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of __ days (give exact ending date if more than 30 days: ____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

John Murray, Special Agent, Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/29/19

*Judge's signature*

City and state: Philadelphia, PA

ELIZABETH T HEY, U S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

1. I, John Murray, am a Special Agent in the Organized Crime Squad of the Philadelphia Division of the Federal Bureau of Investigation ("FBI"), being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

2. I have been employed as a FBI Special Agent since May 2011. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code § 2510(7), and am empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Titles 18 and 21 of the United States Code ("U.S.C."). Prior to joining the FBI, I graduated from the Temple University School of Law and served as an Assistant District Attorney in the Philadelphia District Attorney's Office from 2008 through 2011. During my tenure there, I prosecuted violent crimes and narcotics offenses, in addition to other state criminal violations.

3. As part of my duties with the FBI, I investigate violations of federal criminal law over which the FBI has jurisdiction, including violent crime, narcotics offenses, and organized crime. Over the course of these investigations, I have conducted interviews of witnesses, victims, and suspects, participated in physical and electronic surveillance, and utilized pen registers and trap and trace devices. I have participated in searches authorized by consent, search warrants, and other legal grounds, for residences, businesses, cellular telephones, and vehicles for the purpose of obtaining evidence. While employed by the FBI, I have also participated in investigations classified under the Organized Crime Drug Enforcement Task Force ("OCDETF"), which is a national initiative focused on targeting criminal organizations.

4. I am currently assigned to an FBI squad that investigates the Philadelphia organized crime family of La Cosa Nostra ("LCN"). Through my training, education, and experience, I have become familiar with the hierarchy and organizational structure of the Philadelphia LCN Family, its criminal activities, and the efforts of individuals associated with this criminal enterprise to avoid detection by law enforcement.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested search warrants, but does not set forth all of my knowledge about this matter.

6. Based on the information outlined in this affidavit, as well as my training and experience, I have probable cause to believe that the PHILIP NARDUCCI, operator of CHICK's PHILLY bar and restaurant, d/b/a LA VIVA MIGGS, Inc., and JAMES GALLO have committed the following violations: making extortionate extensions of credit, in violation of 18 U.S.C. § 892, conspiracy to collect and collections of extensions of credit by extortionate means, in violation of 18 U.S.C. § 894, and money

1

laundering, in violation of 18 U.S.C. § 1956, hereinafter referred to as "SUBJECT OFFENSES."

7. This affidavit is submitted in support of an application for a search warrant to search CHICK's PHILLY (also known as "CHICK'S"), 1805-1807 Washington Avenue, Philadelphia, Pennsylvania, 19146, hereinafter referred to as "SUBJECT PREMISES," further described in Attachment A, and to search and seize any and all cellular telephones that may be found in the SUBJECT PREMISES, as set forth in Attachment B.

## FACTS ESTABLISHING PROBABLE CAUSE

8. On or about October 25, 2018, an individual, who will be referred to as Cooperating Witness 1 ("CW-1"[1]) contacted the FBI to advise that CW-1 had been assaulted and threatened by PHILIP NARDUCCI in the office of CHICK'S PHILLY, a bar and restaurant located at 1805-1807 Washington Avenue, Philadelphia, Pennsylvania, 19146, during the collection of a loansharking payment.

9. CW-1 informed fellow FBI agents that, prior to contacting the FBI on October 25, 2018, CW-1 had travelled to CHICK'S PHILLY with another individual, hereafter referred to as Cooperating Witness 2, ("CW-2") to make a weekly $600 interest only payment on an $115,000 loan the CW-1 had borrowed from NARDUCCI. Instead of accepting the payment, NARDUCCI had CW-1 and CW-2 walk into a back room where he locked the door to prevent them from leaving. An unknown male, identified by NARDUCCI as a notary, was also present in the room. NARDUCCI forced CW-1 and CW-2 to produce their driver's licenses and made copies. NARDUCCI demanded CW-1 sign a document that NARDUCCI identified as a loan agreement. NARDUCCI would not allow CW-1 to read the document. When CW-1 refused to sign, NARDUCCI screamed at both CW-1 and CW-2 and then shoved CW-1 across the office. CW-1 ultimately signed the loan document in attempt to prevent the situation from escalating further. As CW-1 and CW-2 tried to leave the restaurant, NARDUCCI threw CW-1 against a car that was parked outside and pushed CW-1's head against the windshield. NARDUCCI called the CW-1 a "rat" and told him/her to go talk to the police. CW-1 identified areas on his/her forearms and torso that were sore from the incident and pointed to a hole on CW-1's shirt that occurred during the altercation.

10. Based on my review of information from the 1988 federal racketeering prosecution in the United States District Court for the Eastern District of Pennsylvania in the case of *United States v. Nicodemo Scarfo, et al.*, Criminal No. 88-00003, I know that a jury

---

[1] From November 30, 2001 through December 12, 2006, the FBI operated CW-1 as a cooperating source on national security matters. Due to his cooperation, CW-1 obtained an immigration benefit from the government. Regarding his past cooperation on national security matters, the FBI considered the information provided by CW-1 to be reliable and credible. The FBI administratively closed CW-1 as a cooperating source in 2006 at the conclusion of the pertinent national security investigations. During the period of CW-1's cooperation, the FBI paid CW-1 a total of $995.20, $500.00 of which was for services rendered and $495.20 was for expenses associated with CW-1's cooperation.

convicted PHILIP NARDUCCI in that case of being a long-time member of the Philadelphia LCN Family who participated in racketeering activity involving two murders and two attempted murders on behalf of the Philadelphia LCN Family. The indictment in that case included nine murders and four attempted murders. Upon this conviction for federal racketeering offenses, NARDUCCI sentenced to 40 years of imprisonment.

11. A review of Federal Bureau of Prison ("BOP") records indicates that NARDUCCI was released from federal custody on May 25, 2012. NARDUCCI's BOP number is 37265-066 and his date of birth is November 17, 1962. Since NARDUCCI's release from prison, FBI Philadelphia has received periodic reporting of NARDUCCI's possible involvement in extortion activities. NARDUCCI currently owns and operates CHICK'S PHILLY, a restaurant and bar located at 1805-1807 Washington Ave. Philadelphia, PA, 19146.

12. According to CW-1, CW-1 first met NARDUCCI in 2015 through JAMES "JIMMY" GALLO. When CW-1 needed money to purchase and renovate an investment property, GALLO referred CW-1 to NARDUCCI. CW-1 borrowed a total of $70,000 from NARDUCCI from 2015 to 2016. The interest on the loan was 30 percent. CW-1 paid back the $70,000 principal in approximately one year. CW-1 estimated to have paid approximately $58,000 in interest on the $70,000 loan. The total amount paid to NARDUCCI was approximately $128,000. The interest rate of this loan equates to 84%. Most of the payments were made in cash, while some were made through cashier's checks. Most of the cash payments were made directly to NARDUCCI. Several times, NARDUCCI sent another individual known to CW-1 as LUIGI SAVOCA to CW-1's business to collect the payments.

13. At the time CW-1 first borrowed money from NARDUCCI, based on CW-1's discussions with GALLO and others in South Philadelphia, CW-1 knew NARDUCCI to be a "mob" member who enjoyed a street reputation for murder and violence. Through others, including GALLO, CW-1 knew NARDUCCI to have a reputation of having committed multiple murders.

14. According to CW-1, between approximately January and June 2018, CW-1 took out several loans from NARDUCCI totaling $115,000. CW-1 paid approximately $30,200 in interest between January 2018 and October 2018. From January 2018 to March 2018, CW-1 made weekly interest payments of $600 for 12 weeks, totaling $7,200. From April 2018 to June 2018, CW-1 make weekly interest payment of $400 for 12 weeks, totaling $4,800. From July to October 2018, CW-1 made weekly interest payments of $1300 for 14 weeks totaling $18,200. None of CW-1's payments applied towards the principal. The effective interest rate for the total loan amount equates to 26.26%. CW-1 also advised that two weeks before the October 25, 2018 assault, NARDUCCI stopped by CW-1's place of business and threatened to shut the business down if CW-1 did not repay the outstanding loan. NARDUCCI also made a hand signal for a gun and said, "this is what I do if you don't pay."

3

15. On October 25, 2018, CW-1 agreed to cooperate with the FBI's investigation of NARDUCCI's loansharking activities. As part of CW-1's cooperation, CW-1 agreed to record meetings and conversations with GALLO, who worked for NARDUCCI in collecting loansharking payments from CW-1.

16. Between October 27, 2018 and January 24, 2019, CW-1, at the direction of the FBI, met with GALLO thirteen (13) times to make loansharking payments to NARDUCCI. CW-1 consensually recorded these meetings, using equipment provided by the FBI. Agents of the FBI, along with Task Force Officers of the Pennsylvania State Police, conducted physical surveillance of these meetings. During this time period, CW-1 made loansharking payments totaling $8,500 to NARDUCCI. The FBI provided all of this money to CW-1 for use in making the payments.

17. On the evening of October 25, 2018, CW-1 placed a recorded phone call to GALLO's cellular telephone, (215) 251-2584. During that call, GALLO told CW-1 that NARDUCCI, "wants his money, so why would he hurt you?" and said that NARDUCCI was probably getting worried that he wasn't going to get paid. GALLO told CW-1 he would see NARDUCCI tomorrow and would talk to him about the incident, referring to what happened at CHICK'S PHILLY earlier that day. CW-1 stated that CW-1 knew NARDUCCI's telephone number to be 267-994-0079. NARDUCCI's previous number was 215-460-1807.

18. On October 27, 2018, at the direction of the FBI, CW-1 met with GALLO at GALLO's house, 2508 South Camac Street, Philadelphia, PA 19148, and recorded the conversation. GALLO told CW-1 that NARDUCCI wanted to know how much CW-1 could pay each week. GALLO told CW-1 that CW-1 should be scared of NARDUCCI, stating, "He's a killer you fucking idiot, He's killed fucking eight people." GALLO also told CW-1 that NARDUCCI wanted CW-1 to deal with GALLO for loan collection payments. During the meeting, GALLO told CW-1: "Well I talked to his wife yesterday. She, she, said it's her money. Which it is. You know that … You know that money, it's her money. I mean he's got money from the business and all but originally, she's got fucking millions or something."

19. On October 29, 2018, CW-1 recorded a meeting with GALLO and paid $600. During the conversation, GALLO told the CW-1 that NARDUCCI doesn't want to hurt CW-1 because he wants his money. GALLO stated, "I'm not saying that he won't come in and strangle you, but he's not gonna kill you."

20. On October 29, 2018, FBI surveillance agents observed GALLO travel from the meeting with CW-1 to his house at 2508 South Camac Street, Philadelphia, PA 19148. After several minutes, GALLO left his house and travelled to CHICK'S PHILLY, 1807 Washington Avenue, Philadelphia, Pennsylvania, 19146. NARDUCCI's known vehicle, a grey Range Rover with a black roof, bearing New Jersey registration R18KKA, was observed on Washington Avenue, in front of CHICK'S PHILLY at the

time GALLO arrived. FBI surveillance agents observed GALLO entering CHICK'S
PHILLY and then leaving the restaurant 10 minutes later.

21. On November 5, 2018, CW-1 recorded a meeting with GALLO and paid $600. CW-1
told GALLO about a text message CW-1 received on November 4, 2018. Based on the
conversation, CW-1 knew the text message to be from NARDUCCI. That telephone
number was 215-609-6259. CW-1 took "screen shot" images of the text conversations
and forwarded them to the FBI. The following are portions of the text message
exchange between NARDUCCI and CW-1:

> NARDUCCI: ROBEAR tomorrow when u see JIMMY give him the 2500 that
> Pierce gave you. After all I was the one who got him to pay u. He
> had no intention at all to pay u. That will go to the seven weeks
> that u missed."

> CW-1:       Hey bro is this you Phil? Pierce never paid me anything what are
> you talking about?

> NARDUCCI: U sure

> CW-1:       Yes I'm sure I wouldn't' like to you. And I'm sorry for anything
> that happened between us.

> NARDUCCI: Listen I did not want any problems whatsoever but you made a
> fool out of me and lued (sic) in my face. You been gambling the
> whole time. I was the only one who helped you [.] You totally
> disrespected my wife.

22. On November 13, 2018, CW-1 recorded a meeting with GALLO and paid $600.
GALLO told CW-1 to write down everything CW-1 has paid to NARDUCCI. FBI
surveillance agents observed GALLO travel from this meeting with CW-1 to CHICK'S
PHILLY, 1807 Washington Avenue, Philadelphia, Pennsylvania, 19146.

23. On November 19, 2018, CW-1 recorded a meeting with GALLO and paid $600.
During this meeting, GALLO said, "You got a fuckin hard head bro. Did you do what I
asked you to do? No! So don't ask me nothing. I don't know what to tell you. I told
ya what to do, you didn't do it. And you still didn't do it. Two weeks later. You still
didn't do it. It's amazing." GALLO was referring to CW-1 writing down everything
that CW-1 already paid to NARDUCCI and the amount still owed to NARDUCCI.
CW-1 began to try to explain the payments that were made. GALLO said he was
making collections for NARDUCCI and wasn't making any money from the
collections.

24. On November 26, 2018, CW-1 recorded a meeting with GALLO and paid $600. Prior
to the meeting, GALLO sent the following text from (215) 251-2584 to CW-1, "Let me
know when I can meet you", "Yo when can I meet up", "Ok takes a second to text me

back and let me know. I don't want to get my balls broke. I don't even want to b
bothered wit this. Did u do what I said? NO. U people got such hard heads. Doesn't
matter to me bro. Was only tryin to look out help ya".

25. During the meeting on November 26, 2018, GALLO told CW-1 that he had brought
NARDUCCI over $300,000 in loans but NARDUCCI was still bothering him for
$12,000. GALLO also asked why CW-1 didn't just sign "the fucking thing,"
referencing the loan document from the incident on October 25, 2018. CW-1 told
GALLO he couldn't pay $5,600 per month. GALLO responded, "So what? Then
you're signing it, who gives a fuck?" CW-1 discussed being concerned that
NARDUCCI could take CW-1 to court if CW-1 signed the document. GALLO
explained that all going to court would do is put a lien on CW-1's property if CW-1
owns a property. CW-1 stated CW-1 was nervous and didn't want to sign the
documet. GALLO responded, "What can they do? All they can do is put a lien on your
property, besides fucking killing you, legally all they can do is put a lien on you
property and you doesn't own anything." CW-1 explained that NARDUCCI gave CW-
1 18 months to pay off NARDUCCI. GALLO told CW-1 that CW-1 should have just
signed it.

26. On December 5, 2018, CW-1 met with GALLO and recorded the conversation. CW-1
did not make the weekly payment that was due on Monday, December 3, 2018.
GALLO told CW-1 that NARDUCCI is waiting for $600.

27. On December 7, 2018, at the direction of the FBI, CW-1 met with GALLO and paid
$500. During the conversation, which CW-1 recorded, GALLO told CW-1 to "stop
playing games" and GALLO accused CW-1 of "playing dumb." GALLO continued
and told CW-1 that it's not GALLO's problem that CW-1 loses their money. GALLO
accused CW-1 of having every excuse and told CW-1 that he was "playing with the
wrong guy." GALLO continued to say, "You know when you're gonna care? When he
shows up with a fucking ski mask and you're gonna say, 'Oh No,' and it's too late.
That's when you're gonna care. That's when you're gonna care. You're gonna say
'Oh No' and that's gonna be the last thing you're gonna fucking say. And that, I don't
care. It's not my problem...." GALLO added: "That's what he does! This is what the
guy does! He's mentioned in fourteen murders! Like, what's your problem?"

28. On December 9, 2018, CW-1 met with GALLO and recorded the conversation. CW-1
asked if GALLO met with NARDUCCI and gave him the money, referencing the
payment of December 7, 2018. GALLO responded that he did. GALLO said
NARDUCCI was mad that the payment was only $500 and said that NARDUCCI
wanted GALLO to remind CW-1 that in two weeks, it will be the eighth week and CW-
1 will need to start paying more than $1,000 per week.

29. On December 12, 2018, CW-1 recorded a meeting with GALLO and paid $600.
During this meeting, GALLO accused CW-1 of lying about not having more money.
CW-1 has seen GALLO carry more than one phone. On Wednesday, December 12,

2018, CW-1 had a lengthy text message exchange with GALLO's cellular telephone number, (215) 251-2584. During the conversation the following exchange took place:

> CW-1:       Do you talk him about the payment 1000 a week I can't pay more in that.
>
> GALLO:     Seeing him tomorrow.
>
> CW-1:       Ok.
>
> GALLO:     You Rob u really just lie every time I talk to you.  That's all u do any more.  I'm not kidding or exaggerating.  Every time we talk u lie.  Like today ur swearing u don't have no more $ at all.  I knew it was a lie because u gave me 6 one hundred dollar bills.  And u were cutting hair for at least a couple hours.

30. On December 14, 2018, CW-1 and GALLO had the following text message exchange:

> CW-1:       Yoo do you talk him about the 1000 a week
>
> GALLO:     No I forgot.
>
> CW-1:       Ok

31. On December 13, 2018, CW-1 had a text message conversation with NARDUCCI's cellular telephone number (215) 609-6259. The following are portions of the text message exchange:

> CW-1:       Hey I know you don't want talk me that okay no problem but I tell Jim to tell you from being frist tow month I pay you 600 and then after the holidays I pay 1000 a week I jus want make myself clear I don't want have problems again I can't pay more! And my friend he tell me the guy he owes me money the 5200 he pay  you I say no will he say he tell me he pay you?  Did he pay the money I want kwon if his laying please let me know thank you.
>
> NARDUCCI: Tell that guy to blow me. I never get any money from him and I don't even know him. Also the money you pay is totally legitimate money.
>
> CW-1:       So did he pay his laying so we good for 1k a week after the holidays
>
> NARDUCCI: He did not pay anything and I do not know him. He does not owe me any money.

7

32. On December 19, 2018, CW-1 recorded a meeting with GALLO and paid $600. During their conversation, GALLO said next week CW-1 will owe more than $1,000. GALLO said, "NARDUCCI has a good life right now and he's not gonna risk it" and that, "NARDUCCI doesn't want to go anywhere near jail."

33. On December 28, 2018, CW-1 recorded a meeting with GALLO and paid $600. During the conversation, GALLO told CW-1 that he "gives the money to the other guy," whom CW-1 understood to refer to NARDUCCI.

34. On January 3, 2019, CW-1 recorded a meeting with GALLO and paid $600. GALLO told CW-1 he gave NARDUCCI CW-1's $600 payment from December 28, 2018. GALLO told CW-1 that NARDUCCI was mad that it was only $600, and not $1,000. GALLO stated he would be meeting with NARDUCCI again the following day.

35. On January 10, 2019, CW-1 recorded a meeting with GALLO and paid $600.

36. On January 12, 2019, CW-1 exchanged a number of text messages, during which GALLO discussed the loan with NARDUCCI. GALLO used telephone number 215-251-2584 to communicate with CW-1.

    CW-1:        Do you talk him

    GALLO:      I still have it here. I told him I have it. He asked why it's only 6 (understood by CW-1 to mean $600). I said idk. He asked if he can give 600 for 4-5 months. Also he wants to know if he can give the same 600 for 3 years. But he never answered me about paying 6 for 4-5 months or for 3 years. He didn't even answer about coming to pick it up so I have no clue what they're goin to do.

37. On January 12, 2019, CW-1 received a telephone call from 267-265-4422. When CW-1 answered the phone, CW-1 did not realize who it was at first. After the caller identified himself as "PHIL," CW-1 realized it was NARDUCCI. During the conversation, NARDUCCI and CW-1 discussed the outstanding loan with NARDUCCI. NARDUCCI said that "JIMMY" said something about "three years." CW-1 told NARDUCCI that CW-1 would start paying NARDUCCI at least $1,000.

38. On January 16, 2019, CW-1 recorded a meeting with GALLO and paid $1000. On January 24, 2019, CW-1 recorded a meeting with GALLO and paid $1000.

39. During the course of this investigation, multiple surveillance cameras have been observed attached to SUBJECT PREMISES. I also know through my experience that modern restaurants, like SUBJECT PREMISES, regularly have surveillance cameras both inside and outside the property. CW-1 has personally observed the surveillance camera monitor inside the SUBJECT PREMISES. Review of these surveillance cameras and collection of their records could provide evidence of the assault of CW-1,

8

as well as associates of NARDUCCI engaged in violations of the SUBJECT OFFENSES.

40. CW-1 advised that when CW-1 paid NARDUCCI money, NARDUCCI would sometimes pocket the money and other times he would take it into his back office at CHICK's PHILLY. CW-1 has personally been in NARDUCCI's office on multiple occasions. CW-1 observed NARDUCCI mark a ledger inside the office that recorded CW-1's payments. The office is located near the bar inside the restaurant. After CW-1 had missed two or three payments in the late summer/early fall of 2018, NARDUCCI told CW-1 he wanted to talk to CW-1. NARDUCCI took CW-1 into the office and showed CW-1 a calendar. NARDUCCI pointed to the calendar and showed CW-1 the records of CW-1's missed payments. The calendar, which was hanging on the wall, included records of CW-1's payments. CW-1 observed other writings on the calendar but CW-1 does not know what those writings recorded. While CW-1 was in the room, NARDUCCI's wife, GINA NARDUCCI came back in the office. At one point, NARDUCCI became irate and grabbed a glass like he was going to hit CW-1 with it. GINA became upset with NARDUCCI and told him not to hit CW-1 with the glass. CW-1 described NARDUCCI's office as being a small office with a door in the corner of the bar on the first floor next to the juke box.

41. Pursuant to a grand jury subpoena, Agents received the records from 2016 to present for Univest Bank and Trust checking account 6311002528 held in the name of La Viva Miggs, Inc., on which Gina Marie Narducci ("GM Narducci") is the sole authorized signer and checking account 47670601 held in the name of Gina Marie Narducci.

42. Between December 16, 2017 and March 31, 2018, La Viva Miggs, Inc. account 6311002528 and GM Narducci account 47670601 were utilized to conduct 12 cash withdrawals that totaled $116,500.00. These debits overlap with the time period (January 2018 – June 2018) that CW-1 says he borrowed a total of $115,000 from NARDUCCI.

43. The withdrawals were all conducted in amounts from $4,000.00 to $20,000.00. Some of the withdrawals are consistent with being structured to avoid the filing of Currency Transaction Reports (CTRs). Four of the withdrawals were conducted in amounts ranging from $8,000 and $9,000, and three of the withdrawals were made in amounts ranging from $4,000 to $6,000.

44. A sample of the withdrawals are as follows: $6,000 on December 23, 2017; $8,000 withdrawal on December 30, 2017; $12,000 withdrawal on January 6, 2018; and $20,000 on January 9, 2018.

45. There were nine check debits, made payable to "P Narducci" between December 21, 2017 and March 19, 2018 that totaled $10,061.56. The checks were issued on a bi-weekly basis with the exception of two checks that cleared on December 21, 2017, check #1478 for $229 and check #1479 for $3,197.92.

## CELLULAR PHONE ANALYSIS

46. CW-1 advised that GALLO has communicated using at least four different telephone numbers: 215-251-2584, 267-608-8939, 215-668-3611 and 267-595-5449.  CW-1 advised CW-1 has communicated with NARDUCCI on at least four different telephone numbers: 267-994-0079, 215-460-1807, 215-609-6259 and 267-265-4422.

47. Between March 1, 2018 and November 27, 2018, there were seventy (70) contacts between GALLO's cellular telephone number (215) 251-2584 and NARDUCCI's cellular telephone number (267) 994-0079.  Twenty-four (24) of these contacts (2 text messages, 22 telephone calls) occurred between the time period of October 24, 2018 and November 27, 2018 (records as of January 3, 2019). According to Sprint Wireless records, cellular telephone number, (215) 251-2584, is subscribed to DONNA D'AGOSTINO, 2508 South Camac Street, Philadelphia, PA 19148 and is assigned to device Electronic Serial Number (ESN) 089463629602507877.  According to Pennsylvania Department of Transportation, GALLO's address on his Pennsylvania driver's license is 2508 South Camac Street, Philadelphia, PA 19148.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

48. This application also seeks permission to search and seize electronic devices, including cellular telephones, for evidence described in Attachment B.  As used herein, the term "electronic device" includes any electronic system or device capable of storing or processing data in digital form, in this case referring specifically to wireless or cellular telephones.

49. Based on my training and experience, I am aware that individuals involved in criminal activity often use multiple cellphones, including but not limited to smart phones or PDAs to store the telephone numbers for their criminal activity associates.  I am aware that those involved with criminal activity often keep old cellphones at their residences to allow the individuals to restore contacts into newer cellphones. I am aware that those involved with criminal activity often keep old cellphones in close proximity to allow them to restore contacts into newer cellphones.

50. In the instant matter, I am aware that both NARDUCCI and GALLO have used multiple cell phones and the information received from CW-1 indicates that they regularly change telephone numbers.

51. Based on my training and experience, I am aware individuals involved in criminal activity often maintain more than one phone or more than one SIM card device, in order to have multiple avenues to facilitate criminal activity, and in an attempt to avoid detection by law enforcement.  I am aware that individuals involved in criminal activity often times utilize pre-paid cellular telephones which do not maintain specific subscriber information, and/or use phones subscribed to in the name of a third person, in order to mask their direct linkage to telephones utilized in furtherance of criminal

10

activity. Further, those involved in criminal activity often change SIM cards in order to make it difficult for law enforcement to determine their records. Based on my training and experience, as well as the training and experience of other agents, I know that individuals involved in criminal activity also frequently switch telephone numbers and/or phones. Despite the constant switching of active telephone numbers, persons engaged in the SUBJECT OFFENSES often keep old phones.

52. Based on my training and experience, I am aware that persons engaged in the SUBJECT OFFENSES commonly utilize their cellular telephones to communicate with co-conspirators to facilitate, plan, and execute their criminal activity. For example, I know that persons engaged in the SUBJECT OFFENSES often store contacts lists, address books, calendars, photographs, videos, and audio files, text messages, call logs, and voice mails in their electronic devices, such as cellular telephones, to be used in furtherance of their criminal activity.

53. Specifically, I know that those involved in criminal activity communicate with associates using cellular telephones to make telephone calls. If they are unable to reach the party called, they frequently leave voice mail messages. I am aware that Apple-based and Android-based phones download voice mail messages and store them on the phone itself so that there is no need for the user to call in to a number at a remote location and listen to the message. In addition, I know those involved in criminal activity communicate with associates using cellular telephones and tablets to send e-mails and text messages and communicate via social media networking sites. By analyzing call and text communications, I may be able to determine the identity of co-conspirators and associated telephone numbers, as well as if there were communications between associates during the commission of the crimes.

54. Furthermore, cellular telephones also contain address books with names, addresses, photographs, and phone numbers of a person's regular contacts. I am aware that persons engaged in the SUBJECT OFFENSES frequently list criminal associates in directories, often by nickname, to avoid detection by others. Such directories as the ones likely contained in the seized cellular telephones, are one of the few ways to verify the numbers (*i.e.*, telephones, pagers, etc.) by others involved in the criminal activity, including victims.

55. In addition, I know that those involved with criminal activity often take photographs or make videos of themselves and their co-conspirators and retain them on their electronic devices such as cellular telephones. This evidence would show associations between accomplices, *i.e.* photographs of accomplices and/or individuals common to co-conspirators. I am also aware that persons engaged in the SUBJECT OFFENSES often take photographs or make videos of proceeds with their cellular telephones and tablets. Based on my training and experience, those who commit these crimes often store these items on their phones in order to show to associates, and/or to upload to social media.

56. Furthermore, I know that electronic devices, such as cellular telephones, can store information for long periods of time. Examples of such information include text and

multimedia message conversations, call history, voice mail messages, e-mails, photographs, and other data stored on the device. Similarly, I know from my training and experience that when cellular telephones are used to access the internet, a browser history is also frequently stored for some period of time on the electronic device. This information can sometimes be recovered with forensic tools.

57. Furthermore, based on my training and experience, I am aware that persons engaged in the SUBJECT OFFENSES often use a cellular phone's Internet browser for web browsing activity related to their criminal activity. Specifically, persons engaged in the SUBJECT OFFENSES may use an internet search engine to explore where banks or mail delivery services are located, or may use the internet to make reservations for travel related to criminal activity. In addition, I know that persons engaged in the SUBJECT OFFENSES also use their cellular telephone's Internet browser to update their social networking sites in order to communicate with co-conspirators.

58. In addition, persons engaged in the SUBJECT OFFENSES sometimes use cellular telephones as navigation devices, obtaining maps and directions to various locations in furtherance of their criminal activity. These electronic devices may also contain GPS navigation capabilities and related stored information that could identify where these devices were located.

59. Furthermore, based on my training and experience, forensic evidence recovered from the review of a cellular telephone can also assist in establishing the identity of the user of the device, how the device was used, the purpose of its use, and when it was used. In particular, I am aware that cellular telephones are all identifiable by unique numbers on each phone, including: serial numbers, international mobile equipment identification numbers (IMEI) and/or electronic serial numbers (ESN). The search of each phone helps determine the telephone number assigned to each device, thus facilitating the identification of the phone as being used by members of the conspiracy. In addition, I am aware that by using forensic tools, information/data that users have deleted may still be able to be recovered from the device.

60. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices. In particular, I know that electronic devices, including cellular telephones used by persons engaged in the SUBJECT OFFENSES, are likely to be repositories of evidence of crimes. I know that an electronic device such as a cellular telephone may contain data that is evidence of how the electronic device was used, data that was sent and received, and other records that may indicate the nature of the offense.

61. Based on my experience and training, as well as the experience and training of other agents, I know that even when a user deletes information from a device, it can sometimes be recovered with forensics tools.

62. Based on my knowledge, training, and experience, as well as information related to me

by agents and others involved in the forensic examination of digital devices, I know that searching electronic devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of electronic devices and software programs in use today that specialized equipment is sometimes necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of electronic devices, operating systems, or software applications that are being searched.

63. Furthermore, I am aware that electronic data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching electronic devices can require the use of precise, scientific procedures that are designed to maintain the integrity of electronic data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on electronic devices.

64. In addition, I know from my training and experience that the volume of data stored on many electronic devices will typically be so large that it will often require a search of the device in a law enforcement laboratory or similar facility. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

65. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), electronic devices can contain other forms of electronic evidence as well. In particular, records of how an electronic device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the electronic devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the electronic device was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the

13

identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

66. Further, evidence of how an electronic device has been used, what it has been used for, and who has used it, may be the absence of particular data on an electronic device. For example, to rebut a claim that the owner of an electronic device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the electronic device remotely is not present on the electronic device. Evidence of the absence of particular data on an electronic device is not segregable from the electronic device. Analysis of the electronic device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

67. Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time consuming manual search through unrelated materials that may be co-mingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the FBI intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B. In addition, given that the affidavit is in support of the search of electronic devices recovered during the execution of a search warrant of the SUBJECT PREMISES, and these electronic devices will be then be stored as evidence with the FBI, there exists reasonable cause to permit the execution of a search of the seized electronic devices at any time in the day or night.

## FORENSIC EVIDENCE

68. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the cellular telephones were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the cellular telephones because:

14

69. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

70. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

71. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

72. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

## NATURE OF EXAMINATION

73. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of any and all cellular telephones found inside the SUBJECT PREMISES. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

74. I know, through my training and experience, as well as from other law enforcement personnel with whom I have spoken and consulted, that persons engaged in the collection of unlawful debts often document the credits and debits of these loans.

## OTHER EVIDENCE

75. In addition to the above, I know that indicia of occupancy, residency and ownership of premises, including but not limited to utility and telephone bills, business records, addressed envelopes, rental, purchase or lease agreements, identification documents and keys are often maintained at a person's business or residence.

76. Based on my training and experience, I know that financial and business records, such as bank statements, canceled checks, checkbooks, passbooks, journals, ledgers, checks, drafts, letters of credit, certificates of deposit, wire transfer documents, money orders, withdrawal tickets, deposit slips, money cash bands, records of mutual funds, stocks, bonds, records of real estate transactions, invoices, bills, loan documents, business and financially-related correspondence and notes, certificates of insurance, lists of assets, records of safe deposit boxes, contain evidence of the controlling, transfer, and/or concealment of assets and the obtaining, controlling, transfer, concealment and/or expenditure of money and that these records can contain evidence of SUBJECT OFFENSES.

77. Based on my training and experience, I know that persons engaged in SUBJECT OFFENSES commonly prepare financial records including tax records or notes or calculations used to prepare taxes, bookkeeping records, records reflecting budgets, income, expenses, investments, bank accounts and, expenditures including expenditure, investment or deposit of cash, or any record of disposition of cash, in order to conceal the proceeds of SUBJECT OFFENSES.

78. In addition, I know that persons engaged in SUBJECT OFFENSES commonly maintain financial statements, bookkeeper's work papers and/or accountant's work papers used in the preparation of corporate and/or business records and tax returns; and communications with accountants, bookkeepers, money service businesses, merchants, retailers, credit card companies, and/or banks personal financial records including tax records or notes or calculations used to prepare taxes, bookkeeping records, records reflecting budgets, income, expenses, investments, bank accounts and, expenditures including expenditure, investments, deposits and records of disposition of cash.

## CONCLUSION

79. Based on the foregoing facts, your affiant believes that there is probable cause that the fruits and/or evidence of crimes specifically, violations of the following offenses: making extortionate extensions of credit, in violation of 18 U.S.C. § 892, conspiracy to collect and collections of extensions of credit by extortionate means, in violation of 18 U.S.C. § 894, and money laundering, in violation of 18 U.S.C. § 1956 ("SUBJECT OFFENSES"), involving PHILIP NARDUCCI, as enumerated in Attachment B, will be found in the SUBJECT PREMISES, as well as in any cellular telephone found inside the SUBJECT PREMISES. Accordingly, I respectfully request that the Court issue a warrant to search the SUBJECT PREMISES as well as any and all cellular telephones found inside the SUBJECT PREMISES.

80. Because of the sensitive nature of the investigation, I respectfully request that this Affidavit and the accompanying Application, Order and Warrant be filed under seal. Disclosure of the contents of the Application, Order and Warrant would jeopardize the

investigation, as the subject is not aware that he is the target of an investigation.

Respectfully submitted,

John Murray
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed
Before me this 29ᵗ day of January ___ _, 2019

Honorable Elizabeth T. Hey
United States Magistrate Judge

17

## ATTACHMENT A

The properties to be searched are:

1. CHICK'S PHILLY, also known as CHICK'S, is a restaurant and bar inside a two-toned, gray building, located at 1805-1807 Washington Avenue, Philadelphia, Pennsylvania 19146. The building is located on Washington Avenue between South Cleveland Street and South Dorrance Street. The western side of the building features the sign that reads "CHICK'S to go" and the eastern side of the building features the CHICK'S logo of a white dog in a black motorcycle helmet.

2. Any and all cellular telephones located inside CHICK'S PHILLY, also known as CHICK'S.

Photographs of CHICK'S PHILLY, also known as CHICK'S, are attached below:



18



## ATTACHMENT B

*Property to be seized*

The following items which constitute evidence of the commission of violations of the following offenses: making extortionate extensions of credit, in violation of 18 U.S.C. § 892, conspiracy to collect and collections of extensions of credit by extortionate means, in violation of 18 U.S.C. § 894, and money laundering, in violation of 18 U.S.C. § 1956 (SUBJECT OFFENSES):

1. Cellular telephones;

2. Financial and business records, including bank statements, canceled checks, checkbooks, passbooks, journals, ledgers, checks, drafts, letters of credit, certificates of deposit, wire transfer documents, money orders, withdrawal tickets, deposit slips, money cash bands, records of mutual funds, stocks, bonds, records of real estate transactions, invoices, bills, loan documents, business and financially-related correspondence and notes, certificates of insurance, lists of assets, records of safe deposit boxes, and all other items evidencing the obtaining, controlling, transfer, and/or concealment of assets and the obtaining, controlling, transfer, concealment and/or expenditure of money;

3. Address and/or telephone books, rolodex indices, business cards, and any papers reflecting names, addresses, telephone numbers, pager numbers, facsimile numbers, electronic mail addresses, and/or telex numbers of business associates, sources of supply, customers, employees, temporary workers, drivers used to transport workers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

4. Corporate and business bookkeeping records and other financial records including trial balances, general ledgers, subsidiary ledgers and journals, disbursement records and/or journals, accounts payable ledgers and records, payroll records, loan receivable and payable ledgers, and cash disbursement journals;

5. Personal financial records including tax records or notes or calculations used to prepare taxes, bookkeeping records, records reflecting budgets, income, expenses, investments, bank accounts and, expenditures including expenditure, investment or deposit of cash, or any record of disposition of cash;

6. Tax records, including tax returns, IRS forms, tax forms of equivalent state and local agencies, and correspondence with the IRS or equivalent state and local agencies;

7. Financial statements, bookkeeper's work papers and/or accountant's work papers used in the preparation of corporate and/or business records and tax returns; and

communications with accountants, bookkeepers, money service businesses, merchants, retailers, credit card companies, and/or banks personal financial records including tax records or notes or calculations used to prepare taxes, bookkeeping records, records reflecting budgets, income, expenses, investments, bank accounts and, expenditures including expenditure, investment or deposit of cash, or any record of disposition of cash;

8. Any and all banking records, including but not limited to monthly savings and checking statements, canceled checks and banking communications, deposit tickets, withdrawal receipts, certificates of deposits, pass-books, money drafts, money orders (blank or endorsed), check cashing logs, wire transfer logs, cashier's checks, bank checks, money orders, safe deposit box keys, safes, money wrappers and wire transfers.

9. Indicia of occupancy, residency, and ownership or use of the subject premises, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, identification documents and keys.

10. The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, thumb drives, and other magnetic or optical media.

11. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as film, videos, or photocopies).

12. Surveillance camera recording equipment, including any storage medium associated with these cameras.

13. Records reflecting cashing of checks or any other check cashing business, or disposition of cash proceeds of that activity.

Any and all cellular telephones located inside the SUBJECT PREMISES may be seized and searched for the following items which constitute evidence of the SUBJECT OFFENSES:

1. Electronic communications relating to the criminal activity,

2. Telephone or address directory entries consisting of names, addresses, telephone numbers; logs of telephone numbers dialed, telephone numbers of incoming, outgoing or missed calls, text messages, schedule entries, stored memoranda, videos, social networking sites and digital photographs,

3. Lists of loan customers and related identifying information,

21

4. Types, amounts, and prices of loans as well as dates, places, and amounts of specific transactions,

5. Any information related to the making of loans, including names, addresses phone numbers, and any other identifying information,

6. Any information related to the methods of providing loans;

7. Any information recording domestic and international schedule or travel related to the described criminal activity, including any information recording a nexus to airport facilities, airport security, or airlines,

8. All bank records, checks, credit cards, credit card bills, account information, and other financial records,

9. Any information related to package delivery services, including but not limited to United States Postal Service, Federal Express and UPS,

10. All data that has been manually programmed into a GPS navigation system, as well as data automatically stored by the GPS navigation system,

11. Stored memoranda; stored text messages; stored electronic mail; stored photographs; stored audio; and stored video,

12. Evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software,

13. Evidence of the attachment of other devices,

14. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device,

15. Evidence of the times the device was used,

16. Passwords, encryption keys, and other access devices that may be necessary to access any of the devices,

17. Records of or information about Internet Protocol addresses used by the device,

18. Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "Favorite" web pages, search terms that the user entered into any Internet search engine, and records or user-typed web addresses, as well as evidence of the posting of

videos, photos, or any material relevant to these crimes to any social networking site.

19. Evidence of user attribution showing who used or owned the electronic devices at the time the things described above were created, edited, or deleted, such as logs phonebooks, saved usernames and passwords, documents, and browsing history.